# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                               Case No. 05-CR-216

SABRINA D. STEWART,

        Defendant.

## RECOMMENDATION ON DEFENDANT'S PRETRIAL MOTIONS

### I. BACKGROUND

On August 23, 2005, a grand jury sitting in the Eastern District of Wisconsin returned a one-count indictment naming Sabrina D. Stewart ("Stewart") as the defendant. The indictment alleges that on or about February 1, 2005, Stewart "in connection with the acquisition of a firearm from . . . a federally licensed firearm dealer, did knowingly and intentionally make a false and fictitious written statement intended and likely to deceive [the dealer], as to a fact material to the lawfulness of the sale and disposition of such firearm," in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). (Indictment at 1-2.) Specifically, Stewart is charged with indicating on a written record that she was the actual buyer of a firearm, when in fact she knew that she was buying the firearm for another person.

In accord with the pretrial briefing schedule issued in this matter, Stewart filed a motion to suppress oral and written statements which she made to the police on February 24, 2005. The court conducted an evidentiary hearing on Stewart's motion to suppress her statements on October 25,

2005. Following the evidentiary hearing, Stewart filed a second motion asking the court to suppress physical evidence recovered from Stewart's apartment, specifically, the firearm in question as well as magazines and ammunition. On December 1, 2005, the court conducted an evidentiary hearing on Stewart's motion to suppress physical evidence. Both motions are now fully briefed and are ready for resolution. For the reasons which follow, it will be recommended that Stewart's motions be denied.

## II. EVIDENTIARY HEARINGS

The following is a brief summary of the testimony proffered to the court at the two evidentiary hearings.

### A. The October 25, 2005 Hearing

<u>Officer Shawn Lauda</u>

Shawn Lauda testified that he is a police officer for the City of Milwaukee and has been so for approximately ten years. Lauda has been assigned to the intelligence division, ATF task force, for the past three years. On February 24, 2005, Officer Lauda was contacted by his supervisor and asked to respond to 4233 N. 45th Place, Milwaukee, Wisconsin. Lauda was sent to 4233 N. 45th Place because uniformed police officers had responded to a domestic violence call at that address and, through conversation with the complainant, discovered that she had purchased a firearm. The uniformed officers suspected that the complainant had straw purchased the firearm for her live-in felon boyfriend. (Tr. at 5-6.)

When Lauda arrived at the residence, Stewart was alone in the living room. Officer Pollard, who had earlier responded to the domestic violence call, showed Lauda where the firearm was

2

discovered, in a closet in an upper bedroom. At that time the firearm had been removed from the closet, but it was later placed back in the closet temporarily so a picture could be taken (Tr. at 7-8.)

After viewing where the gun had been, Lauda interviewed Stewart in the living room of the residence. Nobody else was present at the start of the interview, but at some point an adult female arrived and was using the phone. Lauda told Stewart who he was and that he worked with ATF. He told her why he was there and said he wanted to know the circumstances of Stewart's purchasing the firearm. Specifically, Lauda told Stewart that the officers suspected her of buying the gun for a felon who had fled out of the door when the officers arrived on the scene. (Tr. at 8-10.)

Lauda testified that Stewart was not in custody at that time, nor was her movement inhibited in any way. At one point during the interview Stewart took a personal phone call which lasted for several minutes. Lauda did not interrupt the call. Stewart at no point asked Lauda to leave, and the interview lasted approximately one hour. (Tr. at 10-11.) Stewart provided Lauda with paper work from the store where she had purchased the firearm. Lauda did not remember where Stewart got the paper work from. (Tr. at 12-13.)

Stewart showed Lauda her upstairs bedroom and advised him that the closet from which the gun was recovered was her boyfriend, Antonio Fleming's. The closet contained all men's clothes and Stewart said that only Fleming uses it. Stewart had her own separate closet in the same room. (Tr. at 13.)

When Lauda began to interview Stewart, he asked her if she would answer any questions. Stewart said that she would. Stewart initially denied conducting a straw purchase for Fleming. In Lauda's opinion, it appeared that Stewart had been previously coached to say that she bought the gun for herself, but Lauda did not find this believable. Stewart appeared nervous. (Tr. at 13-14.)

3

Eventually, Stewart told Lauda the truth; she stated that she lied on the form when she bought the gun. To the question on the form asking if the gun was for her, Stewart answered yes, but the truth was that the gun was for Fleming. (Tr. at 14.)

Stewart denied knowing that Fleming was a convicted felon, but she did state that Fleming had been after her for a couple of months to buy a gun. Stewart was nervous about it and didn't really want to do it, but eventually she wound up doing it. Stewart said that she went to Badger Guns to buy the gun, but in fact she went to Gander Mountain. Stewart told Lauda that the gun was paid for with Fleming's credit card, and that as soon as the gun was picked up from the store, Stewart handed the gun to Fleming and has never since possessed it. (Tr. at 14-15.)

During his conversation with Stewart, Lauda went over the form that was used to purchase the weapon with Stewart. The form was a firearms dealer notification form dated February 1, 2005. In particular, Lauda asked Stewart about question 15A, which asks if you are the actual purchaser of the firearm and makes sure you are not purchasing it for somebody else. Stewart answered yes, that she was the actual purchaser, when in fact she was not the actual purchaser. Stewart was buying the gun for Fleming. Stewart admitted to Lauda that she lied on the form. (Tr. at 15.)

After they were done with the interview, Lauda asked Stewart to write down in her own words what had happened, and Stewart agreed to do so. Lauda read Stewart's statement into the record at the evidentiary hearing, and it was also received as Government's Ex. 1. The statement was written and signed in Lauda's presence. (Tr. at 16-18.) At no point while Lauda was at the residence did Stewart ask him to leave. (Tr. at 20.)

At some point Lauda showed the firearm to Stewart and Stewart said that it was the gun that she had bought. The gun was loaded and there was also an extra magazine that was also loaded. The

4

gun was found in a "Timberland Euro hiker boots shoe box" located in Fleming's closet. (Tr. at 21-22.)

On cross examination, Officer Lauda testified that, when he interviewed Stewart, she initially told him that she had purchased the gun for her own protection, but later admitted that that was a lie. Lauda suspected that Stewart was lying and therefore continued to question her. The questioning lasted for more than one hour. During that time, Lauda told Stewart that he suspected that she was taken advantage of by Fleming, but is now scared to admit that she bought the gun for him, for fear of retaliation by Fleming. Lauda told Stewart that he would protect her if Fleming ever threatened her after she told him (Lauda) the truth. Stewart "wound up agreeing with [Lauda] and telling [Lauda] the truth." (Tr. at 23-28.)

Stewart was not scared or nervous during the interview with Lauda. Rather, she was very casual. Lauda believed that the reason Stewart was lying was to cover for Fleming because she feared retaliation, but she did not outwardly appear nervous. However, at the point at which Stewart confessed, she was crying. (Tr. at 28-29.) Stewart said that she purchased the gun at Badger Ammo, but Lauda believed this was a mistake because that was not where the gun was actually purchased. (Tr. at 29-30.)

During the interview, Stewart and Lauda were alone except that a female came for a period of time. Lauda knew that Stewart had children, but he did not remember them being there at that time. Lauda did not recall discussing the children or who might take custody of the children in light of the crime being investigated. (Tr. at 30-33.)

Lauda was aware that the uniformed officers had initially responded to Stewart's residence based on a domestic violence call. Lauda himself, however, did not go into the details of the

domestic violence. He did not see any evidence of physical injury, such as blood or scratches on Stewart, and did not recall if he was aware that Fleming had "strangled" Stewart. When Lauda first encountered Stewart, she was "extremely calm and very relaxed." (Tr. at 35-36.) Lauda was aware that Fleming had fled from the residence in Stewart's car. (Tr. at 37.)

During the course of his encounter with Stewart, Lauda never gave Stewart any orders or commands. Stewart was advised that she was not under arrest. Furthermore, during the course of his interaction with Stewart, Lauda was in and out of the residence, leaving Stewart alone for periods of time, and Stewart also took phone calls and had people over. In Lauda's opinion, it was clear that Stewart could do what she wanted. (Tr. at 39.)

Lauda never told Stewart that if she did not talk to him she would be facing prison time. He did however, discuss with Stewart what a "straw purchase" was and the possible penalties if found guilty. Lauda did not remember telling Stewart a specific time frame for the possible penalties, but he did tell her that imprisonment was a possible penalty if found guilty of a "straw purchase," and that such was both a state and federal crime. (Tr. at 41-43.) Lauda also talked with Stewart about the penalties associated with lying to the police. In that regard, Lauda informed Stewart that lying to the police was also a state and federal crime and carried incarceration as a possible penalty. Lauda did not promise Stewart that he would advocate for her or "go to bat" for her if she told him the truth. (Tr. at 44-46.)

Lauda testified that Stewart did not seem upset by their discussion about possible penalties for making a "straw purchase," but she did become upset when they talked about possible retaliation by Antonio Fleming. Talking about possible retaliation made Stewart cry. (Tr. at 44.) At the end of the interview, Lauda asked Stewart to write down on paper the circumstances of her purchasing

6

the gun.  Stewart agreed.  Lauda testified that when Stewart made her written statement, "her emotions had all spilled out, and she was more calm at that time."  (Tr. at 52.)

<u>Officer Ronald Fohr</u>

Ronald Fohr testified that he is a policeman for the City of Milwaukee and has been so for almost fifteen years.  On February 24, 2005, at approximately 9:00 a.m., there was a call for service to a residence on 45th Place.  The call was an "open line 911 call" with a man and woman fighting. Fohr went to the residence and made contact with Sabrina Stewart.  Stewart told Fohr that "he just ran out the back door."  (Tr. at 60-61.)  Fohr got a description of the person who fled from Stewart and radioed it to his partner.  Fohr's partner pursued the individual.  Fohr testified that upon his arriving at the residence, Stewart was "hysterical" and was claiming that someone had just physically abused her.  Stewart claimed that the person pushed and strangled her, took her cell phone, house phone, and keys, and eventually took her car.  (Tr. at 61-62.)

Stewart began to calm down as Fohr talked with her about things and completed reports.  By the time he was done dealing with her, Stewart was completely calm.  Approximately two more squads responded to the scene other than Officer Fohr and his partner, Officer Pollard.  Fohr noticed that Stewart had some blood on one of her fingers.  (Tr. at 63.)  Officer Pollard communicated with Officer Lauda and told him about the attack that Stewart complained of.  Fohr did not immediately remember if any children were present at the residence, but after reviewing his report, agreed that Stewart's two children were present.  Fohr did not recall if the children were still present when Lauda arrived on the scene.  (Tr. at 64-67.)

Fohr asked Stewart some questions in the course of filling out his paperwork.  He asked Stewart if there were any guns in the house, and Stewart said that there was.  Stewart told Fohr where

7

the firearm was. Fohr then called to Officer Pollard, who was upstairs, to inform him that there was a firearm up there. Pollard said he knew because he had already seen it. At the time that Stewart told Fohr about the gun, she was calmed down and was no longer crying or excited. (Tr. at 68-69.) Officer Fohr testified that often on domestic complaints officers do not get truthful information regarding whether someone lives at the residence. Pollard was therefore trying to establish if there were any men's clothes in the residence or something along those lines. Pollard found the gun in the shoe box upstairs. Fohr questioned Stewart about the ownership of the gun and Stewart informed him that the gun was hers and that she had the papers for it. (Tr. at 69-70.)

## B. The December 1, 2005 Hearing

<u>Officer Mark Pollard</u>

At the December 1, 2005 evidentiary hearing, Mark Pollard testified that he is a police officer for the City of Milwaukee and has been so for approximately fifteen years. On February 24, 2005, Pollard was dispatched to 4233 North 45th Place, Milwaukee, Wisconsin at approximately 9:00 a.m., in response to a 911 hang up call. (Tr. at 4-5.) Pollard and his partner, Officer Fohr, proceeded to the front door of that address, and as the door was being opened, Pollard heard the back door of the unit slam. Suspecting that somebody was running out of the back door, Pollard started around the building toward the back. Once he got around back, Pollard observed an individual walking away "at a pretty good clip." (Tr. at 6-7.)

Pollard told the individual to stop, but the individual proceeded to run. Pollard gave chase for approximately fourteen minutes, and failing to catch the individual, returned to the residence where Fohr was talking with Stewart. Fohr then informed Pollard that Stewart and the individual who had run away were boyfriend and girlfriend and lived in the apartment, and that the individual

8

had battered Stewart earlier. (Tr. at 8-9.) While Fohr was talking to Stewart, Pollard went out to the squad car and got a couple of reports that would be needed for the investigation. He returned to the residence and learned from Fohr that nobody had confirmed that the individual who had run from the scene had not returned. Pollard therefore locked the back door and searched the back area of the apartment to ensure that nobody was there. (Tr. at 10-11.)

Pollard then asked Stewart if the individual who ran resided at the residence, and she answered yes. Pollard asked if the individual had any belongings at the residence, and Stewart again answered yes, in the closet in the bedroom upstairs. Pollard asked Stewart if he could go up and look in the closet, and Stewart said yes. (Tr. at 11-12.) Pollard then proceeded upstairs and checked the bathroom and a children's bedroom to ensure that nobody else was present, and then entered the main bedroom. Pollard observed a closet which contained men's clothing. On the top shelf of the closet, Pollard observed a box, and on the exterior of the box an indication that it contained .40 caliber handgun ammunition. Pollard also observed a shoe box for Timberland shoes, but on top of the box was a pair of tennis shoes that did not belong to the box. He kicked the box and felt that it was heavy and something was inside it. (Tr. at 12-14.)

Pollard opened the box and saw a standard plastic, dark colored gun case with a handle. Pollard opened the gun case and discovered a .40 caliber Smith & Wesson along with two magazines with ammunition inside, and two gun locks. At that point, Pollard contacted his lieutenant by cell phone. (Tr. at 14-16.)

Two children were present in the apartment, but a friend or family member came and picked them up after the officers had been there for about one hour. Lauda arrived on the scene after the children had departed. (Tr. at 18.)

Case 2:05-cr-00216-RTR   Filed 01/11/06   Page 9 of 25   Document 31

After discovering the gun, Pollard went back down stairs and had a conversation with Stewart regarding the gun. Stewart told him that the gun belonged to her and she showed the officers an application form for receiving a firearm. Pollard then placed the gun in the locked trunk of the squad car, and when Lauda arrived, turned the gun over to him. Neither Pollard nor Fohr restricted Stewart to her residence at any time. (Tr. at 19-22.)

Pollard testified that he learned that the suspect who fled had taken Stewart's keys to the residence and to her car, and furthermore, that Stewart's car was now gone and she reported that the suspect had returned and taken it. This was important to Pollard because it meant that the suspect had access to the residence and might return. (Tr. at 24-25.) Furthermore, Pollard testified that there is a protocol that officers follow when responding to domestic violence calls. That protocol requires officers to secure weapons found at the scene of a domestic disturbance. Weapons are not left on the premises in a case like this one because a suspect who is not in custody could return to the scene and use the weapon. (Tr. at 25-27.)

There came a time when Pollard learned that Antonio Fleming lived at the residence. Pollard had a check run on Fleming and learned that he was a convicted felon. (Tr. at 28-29.)

On cross examination, Pollard testified that the picture which was marked Defendant's Ex. 1 is an accurate depiction of the closet where he found the gun. The picture was not taken before Pollard opened the Timberland shoe box, but the items were put back in place so that the picture could be taken. (Tr. at 31-34.) Pollard testified that the gun is heavy and weighs about six or seven pounds. (Tr. at 35.)

Pollard had two objectives for the search he conducted of the residence. The first was to ensure that Fleming or other persons were not present on the scene. The second was to look for

indications that Fleming resided in the apartment. There was no other reason for Pollard's looking around the downstairs and the upstairs of the apartment. (Tr. at 38-39.) Pollard observed bags full of clothing as well as boxes in the apartment, but he did not search them. They were not searched because they were not large enough to hide a person. (Tr. at 39-40.)

While looking in the closet which contained male clothes, Pollard's attention was caught by the ammunition box which was clearly marked as .40 caliber ammunition. Pollard touched the box and could tell that it had ammunition inside. After finding the ammunition, Pollard suspected that there would be a gun to go along with it, and looked for it. Pollard looked for the gun for his and Stewart's safety, and because there is a Milwaukee Police Department policy that requires officers to remove guns from a residence where there had been a domestic violence complaint. At that point Pollard did not know that Fleming was a convicted felon. (Tr. at 40-43.) Pollard testified that, even if the resident of a particular residence complains that they do not want a weapon removed, the police still remove it and issue a receipt. Pollard's attention was immediately drawn to the Timberland box because the shoes on top did not match the box. He nudged the box with his foot and felt that it was heavy. Pollard then opened the box and found the gun case and gun inside. (Tr. at 43-47.)

On re-direct, Pollard testified that, although he was looking for a gun when he opened the box, he was also still looking for evidence that Fleming lived at the residence, and that people often keep personal property in a box. (Tr. at 51.) On re-cross, Pollard testified that Stewart gave him permission to look around upstairs for Fleming or other persons, and also for evidence of Fleming's residence. Before Pollard opened the box, however, Stewart had already told him that Fleming did live at the residence and Pollard had already observed that the closet contained only male clothing. (Tr. at 53-55.)

11

### III.  MOTION TO SUPPRESS STATEMENTS

Stewart initially based her motion to suppress oral and written statements on allegations that the statements were involuntary, and made in violation of *Miranda v. Arizona*, 374 U.S. 436 (1966). In her brief, Stewart expressly abandoned her claim based on *Miranda* and now argues only that the statements were involuntary.  (Def.'s Br. at 6-7.)

A confession is admissible into evidence only if it was made voluntarily.  *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001).  In determining if a confession was voluntary, the question is whether the defendant's will was overborne at the time of the confession.  *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).  "A confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will."  *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997).  Relevant factors in determining whether a confession was voluntary include the nature and duration of the questioning used to secure the confession, whether the defendant was prevented from eating or sleeping, whether the defendant was under the influence of drugs or alcohol, and the defendant's age, intelligence, education, and experience with the criminal justice system.  *Id.*

Furthermore, "coercive police activity is a 'necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment.'"  *Huerta*, 239 F.3d at 871 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Deceit or misrepresentation by the police is relevant in assessing the voluntariness of a confession, it does not, however, render a confession involuntary in and of itself. *Frazier v. Cupp*, 394 U.S. 731,

12

739 (1969). The government has the burden of proving, at least by a preponderance of the evidence, that a confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

In the case at hand, Officer Lauda testified that, when he first spoke with Stewart, she maintained that the gun in question was hers. However, Stewart later confessed that she bought the gun for Antonio Fleming and that she lied on the form that she filled out when she bought the gun. According to Lauda, Stewart confessed that she lied on the form by indicating that the gun was for her, when in fact it was for Fleming. (Oct. 25 Tr. at 14.) Stewart also handwrote and signed a statement indicating that Fleming pressured her to buy the gun and that Fleming paid for the gun and has possessed it since it was purchased. (Gov't Ex. 1 from Oct. 25 hearing.)

Furthermore, Lauda testified that Stewart was "casual" during the interview, that her movement was not inhibited in any way, and that she received at least one phone call and one guest during the interview. Lauda also testified that Stewart appeared to be afraid of possible retaliation by Fleming, and cried during the interview. Moreover, Lauda testified that, although he did inform Stewart that making a straw purchase and lying to the police are crimes and carry possible penalties of imprisonment, he never threatened Stewart that she would go to jail if she refused to talk to him. There is also no evidence that Lauda threatened Stewart in any way regarding the possibility of losing the custody of her children.

Officer Fohr testified that Stewart was hysterical when he initially arrived on the scene, and that she had allegedly been strangled and pushed by Fleming. However, Fohr testified that Stewart began to calm down, and by the time he was done speaking with her, Stewart was completely calm. The police reports filled out that day indicate that Stewart was twenty-four years old at the time of the incident, and according to Lauda, Stewart presented as of normal intelligence.

13

I start by noting that I credit the uncontroverted testimony of Officers Lauda, Fohr, and Pollard. They all testified in a manner which seemed to me to be forthright. The defendant argues that Lauda's credibility is called into question because he had an unusual demeanor on the witness stand and at one point chuckled during cross-examination. Lauda explained his chuckling as the result of feeling badgered by defense counsel. (Oct. 25 Tr. at 25.) Whatever the reason for Lauda's chuckling, I do not think it clouds his credibility. It did not indicate to me that Lauda did not take his oath to tell the truth seriously, or that he was untrustworthy. Lauda promptly apologized for chuckling and in my opinion concluded his testimony in a professional manner. With this in mind, I will assess the circumstances surrounding Stewart's confessions as they were described in the uncontroverted testimony of the officers.

Stewart was twenty-four years old at the time in question. While twenty-four is certainly not an advanced age, it is old enough that the naivete of youth is not a pressing concern. Furthermore, Officer Lauda testified that Stewart seemed to him to be of normal intelligence. Nothing in the record causes me to doubt this assessment. Stewart's written statement contains grammatical and spelling errors, but this does not indicate that she has any limitation in understanding. To the contrary, although grammatically flawed, the content of Stewart's statement conveys that she did understand her circumstances.

Furthermore, Stewart was questioned by Officer Lauda for a little over an hour inside her own home. She was not under arrest or restricted by the police, and although "hysterical" when the police arrived at her residence, Stewart had calmed down by the time Lauda questioned her. The police did not put Stewart through long hours of interrogation, nor did they deprive her of anything, and there is no evidence that the police coerced Stewart with threats. Lauda did inform Stewart of the crime

14

he was investigating (the "straw purchase") and the possible penalties, and also cautioned her that lying to the police is a crime, but such does not constitute coercion. Instead, in my opinion this information simply allowed Stewart to make a rational choice as to how she wished to proceed.

Moreover, the fact that Stewart became emotional and cried during the interview does not indicate that there was any coercion involved. There were numerous reasons why Stewart may have become upset, none of which are the result of police coercion. In the end, the fact that a suspect becomes emotionally upset does not render a confession involuntary. A confession is only involuntary if the suspect's will is overcome by coercion on the part of the police.

To be sure, Stewart endured a traumatic event when her boyfriend physically attacked her on the morning of February 24, 2005. Furthermore, I do not doubt that Stewart was afraid of the possibility that Fleming might retaliate against her should she implicate him in a crime, and there is also no doubt that the possibility of prison time would be unnerving to anybody, especially a mother with small children. However, nothing in the record indicates that the police engaged in coercive activity which overcame Stewart's will.

In sum, based on the totality of circumstances, I am satisfied that Stewart's statements were the result of her own rational choice and were not the result of police coercion which overcame her will. It will therefore be recommended that Stewart's motion to suppress her oral and written statements be denied.

## IV. MOTION TO SUPPRESS PHYSICAL EVIDENCE

Stewart argues that the gun, ammunition, and magazines should be suppressed because they were discovered pursuant to a warrantless search that was not justified by any recognized exception to the warrant requirement. Specifically, Stewart maintains that she gave the police officers consent

15

to search her residence for persons and for evidence that Antonio Fleming lived there, but the police exceeded the scope of her consent by searching inside the shoe box where the gun was found. (Def.'s Br. at 6.) In response, the government first argues that Stewart does not have standing to challenge the search of the closet in the upstairs bedroom because that closet was used exclusively by Antonio Fleming. The government next argues that, even if Stewart does have standing to challenge the search of the closet, the search was justified by Stewart's validly given consent and by exigent circumstances.

## A. Fourth Amendment Standing

"An individual can urge suppression of evidence only if his Fourth Amendment rights were violated by the challenged search or seizure; it is not enough that a person is aggrieved by the introduction of damaging evidence derived from the search." *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996). A person's Fourth Amendment rights are implicated by a search only if that person has a legitimate expectation of privacy in the area or thing searched. *Id*; *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

The government argues that Stewart does not have standing to challenge Officer Pollard's search of the closet in her bedroom because the closet contained only men's clothing. (Gov't's Resp. at 6-7.) The government has not provided any legal authority for its claim, nor has it developed the claim. It appears that the government's claim is based on law limiting a person's ability to consent to a search when he or she has no apparent authority over the area or container to be searched. *See, e.g., United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000).

However, as the government has not developed this argument, the court will not address it any further. I am satisfied, absent some argument to the contrary, that Stewart had a legitimate

Case 2:05-cr-00216-RTR   Filed 01/11/06   Page 16 of 25   Document 31

expectation of privacy in the contents of the closet located in her own bedroom in the upstairs of her residence.

## B. Legality of the Search

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991) (quotation marks omitted). Two of the well-delineated exceptions to the warrant requirement are consent searches and searches based on exigent circumstances.

A search authorized by consent is wholly valid as long as the consent was "freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden of establishing that consent was freely and voluntarily given. *Id*. Whether an individual voluntarily consented to a search is a factual assessment that turns on the totality of the circumstances. *United States v. Raibley*, 243 F.3d 1069, 1075 (7th Cir. 2001).

Furthermore, consent to search does not have to be given by the defendant. Consent is valid if it is given by a person with common control over the searched premises, or apparent authority to consent to the search. *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000). A person has apparent authority to consent to a search if "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quotation marks omitted).

Consent to a search is not an all or nothing proposition. "[A] person may limit or withdraw his consent to a search, and the police must honor such limitations." *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986); *United States v. Mitchell*, 82 F.3d 146, 151 (7th Cir. 1996). In this

17

regard, "[t]he standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

A warrantless intrusion might also be justified by exigent circumstances. The Supreme Court has recognized that such exigent circumstances include hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside a dwelling. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). A warrantless intrusion is not unreasonable if the police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant. *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003).

## 1. Consent

The government argues that the search of the closet and shoe box was justified by Stewart's consent. It is undisputed that Stewart gave Officer Pollard consent to search her residence for persons present and for evidence that Antonio Fleming lived at the residence. (Def.'s Br. at 6.) Indeed, Pollard testified that he asked Stewart if Fleming lived at the residence and Stewart answered that he did. Stewart then told Pollard that Fleming had clothing in the upstairs closet and gave Pollard consent to "go up and look around this closet." (Dec. 1 Tr. at 11-12.)

The scope of Stewart's consent is measured by what a reasonable person would believe it to be. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Pollard testified that he was searching for persons and evidence that Fleming lived at the residence. (Dec. 1 Tr. at 38-39.) In my opinion, it was reasonable for Pollard to believe that Stewart consented to his searching for persons *and* other evidence that Fleming lived there. It would not make sense for Pollard to specifically ask to look

18

around Fleming's closet if he was only looking for persons. Furthermore, Stewart had already told Pollard that Fleming lived at the residence when Pollard asked for consent to look around the closet. Thus, it would appear that Pollard made his request because he was looking for some further evidence, other than Stewart's say so, that Fleming lived there. And it was to such a request that Stewart consented.

Based on the foregoing, I find that Pollard was authorized to search the closet for persons as well as independent evidence that Fleming lived at the residence. Such evidence might consist of clothing, but it might also consist of personal identification listing an address, or mail addressed to Fleming. Those items are small enough to have been in the shoe box. To be sure, I do not believe that Pollard looked in the shoe box for mail. Rather, Pollard's testimony makes it clear that he looked in the shoe box because he suspected that a gun might be inside. Nevertheless, subjective intent alone does not make otherwise lawful conduct illegal or unconstitutional. *Whren v. United States*, 517 U.S. 806, 813 (1996). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id*. Objectively, Pollard was authorized to look in the shoe box for items such as mail or Fleming's personal identification. The fact that Pollard was subjectively looking for a gun does not render his actions illegal.

For the foregoing reasons, I find that Officer Pollard's warrantless search of the closet in the upstairs bedroom of Stewart's residence, and specifically the shoe box which contained the gun, was justified by Stewart's consent. Furthermore, although my recommendation on Stewart's motion to

19

suppress physical evidence will be based on Stewart's consent, I also find that there are additional reasons for denying Stewart's motion.

## 2. Inevitable Discovery

The parties have not raised or argued the applicability of the inevitable discovery doctrine. Nevertheless, it appears that even if Pollard's search of the shoe box in the closet was not justified, the physical evidence might still be admissible because it would have inevitably been discovered. Evidence is properly admissible under the inevitable discovery doctrine, even if it was discovered as a result of an illegal search, "if the government can show that the information 'ultimately or inevitably would have been discovered by lawful means.'" *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003) (quoting *United States v. Gravens*, 129 F.3d 974, 979 (7th Cir.1997)). "To demonstrate that a discovery was truly 'inevitable,' the prosecution must establish that it had probable cause and prove the existence of 'a chain of events that would have led to a warrant . . . independent of the search.'" *Id*. (quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir.1995)).

In the case at hand, putting aside the contested portion of Officer Pollard's search (i.e., his touching the ammunition box and opening the shoe box), there was ample evidence to establish probable cause for a warrant, and there is an independent chain of events which would have led to a warrant being obtained. As will be discussed further below, it is clear that Officer Pollard was justified in searching the closet for persons. Even without opening the shoe box or touching the ammunition box, Pollard observed men's clothing and the ammunition box in the closet. At the same time, and independent of Pollard's actions upstairs, Officer Fohr was questioning Stewart

20

downstairs. Stewart told Officer Fohr that there was a gun in the house and also told him where the gun was. (Oct. 25 Tr. at 68-69.)

Therefore, in an interaction separate from the contested search, Stewart told the officers that there was a gun in Fleming's closet. In my opinion, this would have led the officers to run a background check on Fleming. That check would have revealed, as the actual check did reveal, that Fleming was a felon, and therefore was not allowed to possess firearms or ammunition. This information would have inevitably led to the police seeking and obtaining a warrant to search the closet.

To be sure, the inevitable discovery doctrine cannot be invoked by the police simply saying that they had probable cause, and therefore could have obtained a warrant. If this were the case, probable cause would be the only standard and the warrant requirement would be vitiated. *See United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995). Instead, the prosecution must also establish a chain of events that would have led to a warrant independent of the search. In my opinion, Stewart's telling Fohr about the gun, independent of Pollard's actions, would have led the officers to learn of Fleming's felony record, and then a warrant, and thus constitutes such a chain of events. Therefore, even if Pollard's search of the shoe box was illegal, it appears to me that the evidence would nevertheless be admissible under the inevitable discovery doctrine.

### 3. Exigent Circumstances

The government argues that Officer Pollard's search of the upstairs closet where the gun was found was also justified by exigent circumstances. Although it is a close question, and the facts of this case differ from traditional exigent circumstance cases, it is my opinion that exigent

21

circumstances do form an alternative justification for Officer Pollard's search of the closet and shoe box.

Courts have recognized that warrantless entry into a residence is justified when police reasonably believe someone might be in danger. *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003); *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995). Moreover, it is well recognized that when police justifiably enter a residence, they are also justified in conducting a protective sweep of areas close by as a precautionary measure to ensure that they are not in danger. *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *Brown*, 64 F.3d at 1086.

Upon arriving at Stewart's residence in response to a 911 call, the officers were justified in entering the residence. It was also proper for the officers to conduct a protective sweep of the apartment to ensure that nobody was present who might pose a threat to them or others. Officer Pollard therefore properly looked in the rooms in the upstairs and downstairs of the apartment for persons. It was also proper for Officer Pollard to look into closets because a person could be concealed in a closet.

However, Officer Pollard's looking into the shoe box in the closet cannot be justified by the need to do a protective sweep for persons. Instead, Pollard looked into the shoe box because he saw the box of ammunition and suspected that a gun was nearby. (Gov't's Resp. at 7-8.) The question then becomes, was Pollard's search of the shoe box justified by exigent circumstances? That is, was Pollard's search of the shoe box justified by a risk of danger to the officers or others present? In my view, under the particular facts of this case, it was.

In the case at hand, when Officer Pollard searched the shoe box he knew that Antonio Fleming had physically attacked Stewart that morning and then fled the police. When Pollard arrived

at the residence Stewart had blood on one of her fingers and complained of having been "strangled." Moreover, Fleming's whereabouts were unknown at the time. The police did know that Fleming had keys to the apartment and that he had already returned to the apartment once, after fleeing the police, in order to gain possession of Stewart's vehicle. Knowing all of this information, while Pollard was properly conducting a protective sweep, he observed a box of ammunition in plain view and suspected that a gun was nearby.

In *Brown*, the Seventh Circuit commented that in the context of police entering a residence, "[w]e do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams." *Brown*, 64 F.3d at 1086. In my view, the situation at hand is analogous. I do not think the officers were required to wait and see if Fleming would return before they took steps to locate a weapon which the ammunition signaled was likely nearby.

It might be argued that the police could have ensured their safety by other means; for example, by posting officers at the entrances to the apartment for the duration of their stay. However, such actions would not address concerns for Stewart's safety once the officers left, and in any event, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render [a] search unreasonable." *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973). It might also be argued that exigent circumstances did not exist because the police had time to seek a warrant. However, "[t]he question posed by the fourth amendment is not whether it would have been reasonable to get a warrant, but whether the search itself was reasonable." *Brown*, 64 F.3d at 1086 (citing *United States v. Edwards*, 415 U.S. 800, 807 (1974)).

Case 2:05-cr-00216-RTR   Filed 01/11/06   Page 23 of 25   Document 31

In my view, under the particular facts of this case, Officer Pollard's search of the shoe box was not unreasonable. I do not hold that police would be justified in searching an entire house for weapons any time they are called to respond to a domestic dispute. Whether exigent circumstances exist is necessarily a case by case consideration. Here, when he searched the shoe box, Officer Pollard was aware that Antonio Fleming had already committed one act of violence that day, had keys to the apartment, and had already displayed a willingness to return to the vicinity of the apartment despite police presence. Knowing all of this, Pollard saw a box of ammunition and rightly conjectured that a gun was also present. In my view, it was not unreasonable for Pollard to search the immediate vicinity for a weapon in order to ensure the safety of the officers and others present.

For all of the foregoing reasons, I conclude that the police officers' actions which led to the discovery of the gun, ammunition, and magazines, did not violate Stewart's Fourth Amendment rights. Simply put, Stewart consented to the search in question. Furthermore, as alternative reasons for my recommendation, I find that Officer Pollard's search of the closet and shoe box was justified by exigent circumstances, and in any event, the evidence is admissible under the inevitable discovery doctrine. Consequently, it will be recommended that Stewart's motion to suppress physical evidence be denied.

## V. RECOMMENDATIONS

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress oral and written statements be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's motion to suppress physical evidence be **DENIED**.

24

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) - (C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 11th day of January 2006, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge